

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: July 20, 2018.**

_____
 **CRAIG A. GARGOTTA
 UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| COTTER TOWER - OKLAHOMA, L.P., | § | CASE NO. 17-52844-CAG |
| | § | |
| DEBTOR | § | CHAPTER 11 |

**ORDER (I) APPROVING PROCEDURES
FOR THE SALE OF 100 N. BROADWAY AVE., OKLAHOMA CITY,
OKLAHOMA, (II) APPROVING CERTAIN BID PROTECTIONS, AND
(III) APPROVING THE FORM, MANNER AND SUFFICIENCY OF NOTICE**

On this day, came on to be considered the Motion for an Order (I) Approving Procedures for the Sale of 100 N. Broadway Ave., Oklahoma City, Oklahoma, (II) Approving Certain Bid Protections, and (III) Approving the Form, Manner and Sufficiency of Notice (the "Motion") filed by Cotter Tower-Oklahoma, L.P. (the "Debtor" herein). The Court, having considered the Motion, the evidence presented, and the statements and argument of counsel, finds that the Motion has merit and should be **APPROVED** as provided herein.

In connection with this Order, the Court makes the following findings of fact and conclusions of law herein for the purposes of Bankruptcy Rule 7052, made applicable pursuant

to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

Notice of the Motion and the proposed entry of this Sale Procedures Order was adequate and sufficient under the circumstances of the case, and such notice complied with all applicable requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of this Court.

The Debtor in this case is a Texas Limited Partnership with its principal place of business located in San Antonio, Texas. The Debtor owns and operates a thirty-six-story commercial office building located at 100 N. Broadway Ave., Oklahoma City, Oklahoma, which is commonly known as "Cotter Ranch Tower". The real estate and personal property related thereto which are the subject of the Motion are more particularly described in Exhibit "1" submitted therewith, and incorporated herein by reference (hereinafter known as "the Property").

On February 5, 2018, the Debtor filed an Application to Employ CBRE, Inc. as Real Estate Broker for the Debtor-in-Possession (Doc. 36). An Order Approving the retention of CBRE as Broker for the Debtor was entered on February 22, 2018 (Doc. 41) under the terms of the Exclusive Sales Listing Agreement attached to the Application (the "CBRE Listing Agreement").

Pursuant to the terms of the CBRE Listing Agreement, CBRE marketed the Property employing a thorough and time-tested sales process which commenced January 15, 2018, and

ended on or about May 1, 2018. Specifically, CBRE took the following steps to market the Property:

      A.      On or about February 22, 2018, CBRE released an offering announcement, or "flyer", which was a 16-page color brochure entitled "Executive Summary – Cotter Tower", containing basic information about the Property, its location and market, as well as full color photographs of the interior and exterior of the building. CBRE sent the Executive Summary to more than 2,115 buyers in its database, inviting them to seek additional information on the Property.

      B.      On or about March 2, 2018, CBRE released an offering memorandum which was a 69-page detailed and full color presentation that addressed significant information relating to the Property, its tenancy, and the Oklahoma City market. A detailed financial analysis of the Property was later included. The offering memorandum was delivered to the 77 potential investors that returned a completed confidentiality agreement.

      C.      CBRE set up a Virtual Data Room (the "VDR") containing the following types of documents that a potential buyer would find important prior to making a decision about bidding on the Property: copies of leases, operating statements, service agreements and capital expenditure histories.

      D.      CBRE received 77 requests from potential buyers interested in obtaining more information through the VDR. Each potential buyer was required to execute a confidentiality agreement as a condition to accessing the information contained in the VDR. A total of 77 interested parties executed such agreements and accessed information in the VDR.

      E.      CBRE set a timeline for potential buyers to make bids on the Property. Buyers

first presented offers beginning April 6, 2018. Initially, CBRE received a total of eleven (11) bids from prospective buyers. Thereafter, CBRE narrowed the list to those parties who submitted the highest bids, and set a "Best and Final Bids Due" date for such parties. CBRE then received updated bids from some of the parties who increased their bids, as well as additional offers. In total, seven (7) final/revised offers were received on or about April 20, 2018. Thereafter, CBRE and the Debtor's representatives conducted interviews with the potential buyers.

At the conclusion of the marketing period, Debtor's representative determined that an offer by BancFirst Corporation ("BancFirst") in the amount of $23,000,000.00 is the highest and best offer for the Property. The offer by BancFirst and the PSA (defined below) contains no financing contingency. BancFirst is financially capable of consummating the purchase and performing its obligations under the PSA. BancFirst anticpates relocating its corporate headquarters to the Property so it will be an owner occupier of the Property. That will enhance the likelihood that BancFirst will continue to expend resources necessary to assure future performance of its obligations as landlord of the non-bank tenants and to manage the Property in its best interest.

On April 30, 2018, Debtor's representative advised BancFirst, through the parties' brokers, that it had submitted the best and highest offer.

Counsel for BancFirst, the Debtor, and the Estate of James F. Cotter have negotiated and executed a Purchase and Sale Agreement, a true and correct copy of which is attached to the Motion as Exhibit "1" (the "PSA"). Under the terms of the PSA, the parties acknowledge that "[g]iven the extraordinary marketing period that Seller has conducted, each of Buyer and Seller

acknowledges and agrees that it believes this Agreement is the highest and best offer to purchase the Property." Notwithstanding this fact, Debtor's representative desires to sell the Property for the highest price possibly attainable and has therefore requested that the sale contemplated under the PSA facilitate a procedure whereby a higher and like bid could possibly be submitted if a potential qualified buyer desires to do so. BancFirst has agreed to such procedure, subject to the bid protections set forth in the PSA which recognize the significant time and expense thus far expended by BancFirst in its effort to acquire the Property.

The Court finds that the Debtor, in consultation with CBRE, has employed an efficient marketing process that has been reasonably calculated to maximize the benefit of the sale of the Property for the Debtor's estate and its creditors.

The Court further finds that the Debtor's desire to seek approval of the sale to BancFirst, subject to any potential "higher and better" offers, is well taken and would be facilitated by the Sale Procedures set forth in the Motion.

The Court further finds that the Debtor has demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation: (i) approval of the proposed Sale Procedures; (ii) approval of the Bid Protections for BancFirst; and (iii) approval of the proposed form, manner and sufficiency of notice set forth herein. Such compelling and sound business justification, which was set forth in the Motion and on the record at the hearing for such Motion, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

The Court further finds that entry of this Sale Procedures Order, is in the best interests of

the Debtor and the Debtor's estate and creditors, and it reflects a sound exercise of the Debtor's representative's business judgment. The Sale Procedures set forth herein are fair, reasonable, and appropriate and represent the best method for maximizing the value of the Debtor's estate. The Court further finds that the Bid Protections: (i) shall, if triggered, be an actual and necessary cost and expense of preserving the Debtor's estate, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code in accordance with the PSA; (ii) are commensurate to the real and substantial benefit conferred upon the Debtor's estate by BancFirst; (iii) are reasonable and appropriate, including in light of the size and nature of the transaction and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by BancFirst, notwithstanding that the transaction is subject to higher or better offers; and (iv) were necessary for BancFirst to agree to pursue the sale transaction and be bound by its terms.

The Court further finds that the Sale Procedures and Bid Protections were a material inducement to, and express condition of, the willingness of BancFirst to submit a bid through execution of the PSA that will serve as a minimum or floor bid on which the Debtor, its creditors, suppliers, vendors, and other bidders may rely.

The Court further finds that the terms of the PSA and Sale Procedures (including, without limitation, the Bid Protections) were negotiated by the parties at arms' length and in good faith by the Debtor and BancFirst.

The Court further finds that the proposed Sale Procedures set out in the Motion are designed to maximize value for the Debtor's estate, while ensuring an orderly and efficient conclusion to the Debtor's extensive marketing process.

It is therefore, **ORDERED, ADJUDGED and DECREED** that the Motion is in all respects **GRANTED**.

It is therefore, **ORDERED, ADJUDGED and DECREED** that any objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are hereby overruled; provided however, at closing of the sale, the secured debt owing to Bank SNB (now a division of Simmons Bank) and the ad valorem taxes (including interest and penalties) owing to governmental authorities, will be paid in full from the sale proceeds.

It is further, **ORDERED, ADJUDGED and DECREED** that the Sale Procedures set forth in the PSA submitted with the Motion are hereby **APPROVED**, and the following procedures (the "Sale Procedures") shall govern the sale of the Property:

A. Definitions:

Assumed Leases. For purposes of this Sale Procedure Order only, the term Assumed Leases shall refer to all of the leases between the Debtor and its current tenants.

Bid Deadline. The deadline to submit a Qualified Bid[1] (as defined herein), which shall be the later of the expiration of the Due Diligence Period or the date established by the Bankruptcy Court for the submission of such Qualified Bids (the "Bid Deadline")

Break-Up Fee. "Break-Up Fee" means an amount equal to three percent (3%) of the Purchase Price.

Expense Reimbursement. "Expense Reimbursement" means the costs, fees and expenses (including reasonable legal, financial advisory, accounting and other similar costs, fees and expenses) incurred by BancFirst or its affiliates in connection with the negotiation, documentation and implementation of the PSA and the transactions contemplated thereby, in an amount not to exceed $250,000.00.

Purchase Price. The purchase price for the Property shall be Twenty-Three Million Dollars ($23,000,000.00) (the "Purchase Price").

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Purchase and Sale Agreement and Escrow Instructions, as applicable.

B. Given the extraordinary marketing period that the Debtor's broker has conducted, both the Debtor, as Seller, and BancFirst, as Buyer, each acknowledge and agree that they believe that the PSA constitutes the highest and best offer to purchase the Property.

C. Debtor shall not initiate contact, solicit, or encourage submission of any inquiries, proposals, or offers by any person or entity with respect to a transaction involving the direct or indirect sale, transfer, or disposition of the Property to a purchaser or purchasers other than Buyer or effecting any other transaction (including a Chapter 11 plan) the consummation of which would be substantially inconsistent with the transactions contemplated in the PSA (a "Competing Transaction"), provided that Debtor is permitted to respond to any unsolicited proposals with respect to a Competing Transaction. In such event, Debtor shall provide prompt written notice to BancFirst of the receipt of any such unsolicited proposal to acquire the Property or request for information regarding the Property or access to the Debtor's documentation related to the use, ownership, or occupancy of the Property.

D. Notwithstanding anything contained in the PSA to the contrary, Debtor shall not entertain or consider any offer to purchase the Property from any third party other than BancFirst unless the offer is a "Qualified Bid" (as defined herein) which must be received by the Debtor no later than the Bid Deadline. Among other things, a Qualified Bid must contain a bona fide offer to purchase the Property on the following terms:

(i) the purchase price in the Qualified Bid is greater than the sum of (A) the Purchase Price, (B) the Expense Reimbursement, (C) the Break-Up Fee, and (D) $100,000;

(ii) the Qualified Bid provides for a cash deposit equal to or greater than the Deposit;

(iii) the Qualified Bid must be on terms no less favorable (and no more burdensome or conditional) to Seller than the terms of the PSA;

(iv) the Qualified Bid does not include any contingency relating to due diligence or financing, or any other material conditions precedent to the Buyer's obligation to close, that is not otherwise contained in the PSA;

(v) the Qualified Bid must contain a marked copy of the PSA identifying any changes from the PSA desired by the bidder;

(vi) the bidder in the Qualified Bid demonstrates that it is financially able to consummate the Competing Transaction and provides adequate assurance of its ability to perform the obligations of the landlord under the Assumed Leases;

(vii) the Qualified Bid must expressly exclude any right to receive a break-up fee, expense reimbursement, termination fee, or any similar form of compensation; and

    (viii) the Qualified Bid must provide for the purchase of all or substantially all of the Property.

  E. Debtor shall provide prompt written notice to BancFirst of the receipt any Qualified Bid, which notice shall include in reasonable detail sufficient information to confirm the Qualified Bid's satisfaction of the requirements set forth above.

  F. In the event the Debtor does not receive a Qualified Bid prior to the expiration of the "Bid Deadline", Debtor and BancFirst shall proceed to the Close of Escrow as contemplated by the PSA and Debtor shall thereafter not be entitled to entertain or enter into any bids for the Property, regardless of whether the bid is a Qualified Bid.

  G. If Debtor does receive a Qualified Bid prior to the Bid Deadline, Debtor shall request an expedited hearing in the Bankruptcy Court to be set as soon as the Court's docket will accommodate such request. Debtor shall request that the Court consider any higher or better offers that may have been presented to the Debtor and determine whether or not they are Qualified Bids. If the Court determines that any such offer(s) are Qualified Bids, the Court shall schedule and conduct an auction (the "Auction"). BancFirst shall be deemed to be a Qualified Bidder and shall be permitted to participate in the Auction.

  H. "Auction Procedures" - (i) unless otherwise ordered by the Bankruptcy Court prior to the Auction for cause shown, any bidder (other than BancFirst) that has failed to provide a Qualified Bid by the Bid Deadline shall be disqualified from participation in the Auction; (ii) at the commencement of the Auction, Debtor's representative shall determine based on the nature of the Qualified Bids, the bid to serve as the lead bid in the Auction (the "Baseline Bid"), which bid will at the commencement of the Auction be announced to all bidders participating at the Auction; (iii) participating bidders (including BancFirst to the extent it so chooses) will be permitted to increase their bids and to agree to modifications to their bids in order to make their bids more favorable to the Debtor, provided, subject to the following clause (iv), that each bid shall exceed the preceding bid by $100,000.00 or a multiple thereof; (v) solely for purposes of determining the Successful Bids (as defined below), any overbid submitted by BancFirst shall be deemed to include the full amount of the Break-Up Fee and Expense Reimbursement Payment potentially payable; and (vi) at the conclusion of the Auction, the Court shall determine, considering factors such as the financial and contractual terms of each bid and factors affecting the speed, certainty of closing each bid and net proceeds to the Bankruptcy Estate, the highest or otherwise best bid (the "Successful Bid").

  I. If BancFirst is not the proponent of the Successful Bid and a transaction is thereafter consummated with another third party purchaser resulting in a closing of a sale of the Property pursuant to a Competing Transaction, then the PSA shall automatically terminate and the Debtor will pay to BancFirst, in cash, the Break-Up Fee and the Expense Reimbursement pursuant to the Sale Procedure Order. The Break-Up Fee and Expense Reimbursement shall be paid in cash concurrently with the consummation and closing (which, in the case of a plan of reorganization or liquidation, shall be the effectiveness) of the first Competing Transaction to occur simultaneously with or following the termination of the PSA and shall be paid from the

first proceeds of such Competing Transaction prior to payment of any other claims, including claims secured by the assets that are the subject of the Competing Transaction, until the Break-up Fee and Expense Reimbursement are paid in full. For the avoidance of doubt, nothing in the preceding sentence shall limit BancFirst's recourse with respect to the Break-Up Fee and Expense Reimbursement to the proceeds described therein, and the Break-Up Fee and Expense Reimbursement will constitute, pursuant to sections 364 and 503 of the Bankruptcy Code, a superpriority administrative expense claim in Debtor's bankruptcy estate and in any successor bankruptcy estate of any chapter 7 proceeding following any conversion of Debtor's chapter 11 case, with priority over any and all administrative expense claims. Any Break-Up Fee and Expense Reimbursement payable pursuant to the PSA will be allowed and paid, without any further Bankruptcy Court approval or order.

J. Notwithstanding anything to the contrary contained herein, upon timely payment of the Break-Up Fee and Expense Reimbursement to BancFirst in accordance with Section 15.2 of the PSA and this Order, Debtor and its respective representatives and affiliates, on the one hand, and BancFirst and its respective representatives and affiliates, on the other hand, will be deemed to have fully released and discharged each other from any liability resulting from the termination of the PSA and neither Debtor and its respective representatives and affiliates, on the one hand, and BancFirst and its respective representatives and affiliates, on the other hand, nor any other person or entity will have any other remedy or cause of action under or relating to the PSA or any applicable law.

It is further, **ORDERED, ADJUDGED and DECREED** that the Court shall set a hearing on the Debtor's motion to sell the Property free and clear under 11 U.S.C. §363 on August 15, 2018, @ 1:00 p.m. Debtor shall be responsible for providing notice of said hearing upon the filing of its motion.

# # #

Order Submitted By:

H. Anthony Hervol
LAW OFFICE OF H. ANTHONY HERVOL
4414 Centerview Drive, Suite 200
San Antonio, Texas 78228
(210) 522-9500
(210) 522-0205 (Fax)
email: hervol@sbcglobal.net